ELIZABETH W. PLATT et al., Appellants, v.
DAVID R. FRANCIS et al., Appellants.

**In Banc, December 31, 1912.**

1. **POWER OF ATTORNEY: Agent's Authority to Buy and Sell Stocks on His Own Account.** A power of attorney given by a mother to a son to pledge her bonds and securities in the buying and selling of stocks in her name, did not authorize him to pledge those stocks and bonds as collateral security for stocks bought in his own name. However broad was the power to use her money, securities and properties in buying for her and in her name, it did not authorize him to use those things in his own deals.

2. ————: ————: **Ratification of Unauthorizd Acts.** One who accepts the fruits of the unauthorized acts of an agent, knowing that he has exceeded his authority, adopts and ratifies those acts. Where the agent had no power, either under his general agency or a special power of attorney, to pledge the securities of his mother in his own stock deals, but after full knowledge that he had so used them she accepted all the profits of those deals and directed them to be closed out and took the proceeds arising therefrom, she cannot be heard to contend that the broker, who acted in good faith in the belief that the power authorized the son to pledge said securities, must reimburse her for the collateral securities thus pledged.

   *Held*, by BROWN, J., dissenting, with whom KENNISH, J., concurs, that the evidence totally fails to show that the mother or her attorney, at the time he directed the deals to be closed out and accepted the proceeds for her, knew that the son had exceeded the grant of his power of attorney in pledging her securities as collateral with the broker, and therefore there was no ratification or estoppel.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

REVERSED AND REMANDED (*with directions*).

*Isaac H. Lionberger* for plaintiff-appellants.

(1) The securities sued for belonged to plaintiffs. Charles R. Platt appropriated them in disregard of his trust, and without the knowledge of plaintiffs hy-

pothecated them with the defendants to secure his own debt. (2) The defendants had notice and knowledge of the plaintiff's title. The stock certificates were in the name of Mrs. Elizabeth W. Platt. The bonds were purchased for Mrs. Platt, the life tenant, by the defendants. (3) The power of attorney did not authorize Charles R. Platt to sell or dispose of the securities in his own name and for his benefit, but only in the name, on behalf, and for the benefit of Elizabeth W. Platt. The power did not authorize a pledge of the securities. Warner v. Martin, 11 How. 209; Story on Agency, secs. 68, 73, 113; Gerard v. McCormack, 14 L. R. A. 234; Woodward & Co. v. Jewell, 140 U. S. 247. (4) The defendants are not entitled to the status of innocent purchasers for value without notice in the ordinary course of business. (a) They accepted the securities with knowledge of the fiduciary character of the agent, and the owner's right. Bank v. O. V. Co., 70 L. R. A. 312; Lee v. Smith, 84 Mo. 304; Duncan v. Joudon, 15 Wall. 165; Gerard v. McCormack, 14 L. R. A. (N. Y.) 234; Shaw v. Spencer, 100 Mass. 389; Bank v. Ins. Co., 104 U. S. 54; Farmington v. Railroad, 5 L. R. A. (Mass.) 849; Lamson v. Beard, 45 L. R. A. 822. (b) They took them upon a past consideration to secure an existing indebtedness. Goodman v. Simonds, 19 Mo. 114; Loewan v. Forsee, 137 Mo. 42; Taft v. Chapman, 50 N. Y. 445. (5) Plaintiffs are not estopped to set up their title merely because they left with Charles R. Platt the physical possession of the securities sued for, since they had no cause to suspect his fidelity and were ignorant of his operations. Knox v. Eden-Musee Co., 148 N. Y. 441; O'Herron v. Gray, 168 Mass. 573; Ballard v. Burgett, 40 N. Y. 314; Kickens v. Teasdale Co., 105 Mo. App. 463; Young v. Brewster, 62 Mo. App. 628. (6) The defendants sold the securities to satisfy Charles R. Platt's debt and appropriated the proceeds to the payment of his debt. They converted them to their own

use in disregard of plaintiff's right, and are liable for their value. Swim v. Wilson, 13 L. R. A. 605; Jenney Clarkson Home v. Railroad, 70 L. R. A. 787, 182 N. Y. 47; Ackerman v. Green, 195 Mo. 124; Stevens v. Elwell, 4 Maule and S. 259; Kimball v. Billings, 55 Me. 147; Dusky v. Rudder, 80 Mo. 400; 4 Sutherland on Damages, sec. 1137; Mohr v. Langan, 162 Mo. 494; Tipton v. Burton, 58 Mo. 436; Knipper v. Blumenthal, 107 Mo. 670; May v. Le Claire, 11 Wall. 217. (7) The plaintiffs are entitled to indemnity and are not restricted to the price received at a forced sale in time of extreme depression. The proper measure of their damage is the market price over a reasonable period of time. Comm. Co. v. Railroad, 64 Mo. App. 590; Galigher v. Jones, 129 U. S. 194; Joyce on Damages, secs. 1146, 1177, 1179; Sutherland on Damages, secs. 1119, 1120.

*A. & J. F. Lee* and *Morton Jourdan* for defendant-appellants.

(1) The general powers given Charles by the family over the property of the estate, authorized the pledges he made of its property, and Mrs. Platt's children are estopped to deny the powers exercised by him and by her over the property which is the subject of this suit. Harrison v. McReynolds, 183 Mo. 548. (2) The power of attorney gave Charles power to indorse his mother's name, as her attorney, to any transfers made, and made the recitals of the transfer binding on her and the family, and gave Charles power to pledge or sell the stock so indorsed. Lamy v. Burr, 36 Mo. 85; Hill v. Bank, 87 Mo. App. 590; Muth v. Goddard, 28 Mont. 237; Posner v. Bayless, 59 Md. 56; Blaisdell v. Bahr, 77 Ga. 381; Reinhard on Agency, sec. 200. (3) The appellants have ratified all the transactions which Francis had with Charles, by the acceptance, with knowledge, of the proceeds of those

transactions.  Hartman v. Hornsby, 142 Mo. 368; Bohlmann v. Rossi, 73 Mo. App. 312; Broughton v. Sumner, 80 Mo. App. 386; Suddarth v. Empire Rind Co., 79 Mo. App. 585; Szymanski v. Plassan, 20 La. Ann. 90; Strasser v. Conklin, 54 Wis. 102; Taylor v. Bank, 174 N. Y. 181; Bank v. Metcalf, 29 Mo. App. 384, 40 Mo. App. 494; White v. Saunders, 32 Me. 188; State ex rel. v. Harrington, 100 Mo. 170; Wallace v. Lawyer, 90 Ind. 499; Jones v. Atkinson, 68 Ala. 167; Latham v. Bank, 40 Kan. 9; Thacher v. Pray, 113 Mass. 291; Hazleton v. Batchelder, 44 N. H. 40.

GRAVES, J.—Plaintiffs, who are the widow and all the children of Henry S. Platt, deceased, except Charles R. Platt, sue the defendants for the conversion of stocks and bonds of the alleged value of $134,000.  Charles R. Platt, one of the children of the said Henry S. Platt, deceased, is made a party defendant.  The other defendants make up and constitute the firm of Francis Bro. & Co.  Plaintiffs had judgment below in the sum of $30,177.20, and from this judgment both plaintiffs and defendants have appealed.

Henry S. Platt died in the city of St. Louis in the year 1893, leaving a will.  He left also a personal estate of about $200,000.  This will, after certain specific bequests, thus disposed of the remainder of the property:

"All the residue and remainder of my estate, both real, personal and mixed, whether 'reduced to possession or in expectancy at the time of my death, together with all moneys on hand in bank, due or to come due, all bonds, stocks, policies of insurance on my life, and from every other source whatsoever, I give and bequeath to my wife, Elizabeth W. Platt, for and during her life, and after her decease, all that is left of the estate, shall be divided among my surviving children, share and share alike."

The estate was duly administered upon in the probate court. Charles R. Platt, who was one of the executors of the will, seems to have been the chief adviser and business agent of his mother and the other children. By consent of all parties the personal property of the estate, or a large part of it, was finally invested in the following securities:

17 bonds of the Republic of Mexico, which were unregistered, and negotiable by delivery; alleged to be worth $17,000;

· 500 shares of preferred stock of the American Car & Foundry Company, issued to and standing in the name of Elizabeth W. Platt, alleged to be worth $40,000;

60 shares of preferred stock of the American Car & Foundry Company, issued to Charles R. Platt as trustee for his brother, Richard B. Platt.

570 shares of preferred stock of the National Lead Company, issued to and standing in the name of Elizabeth W. Platt, and alleged to be worth $65,000;

103 shares of stock of the Pittsburg Plate Glass Company, issued to and standing in the name of Elizabeth W. Platt, and alleged to be worth $12,000;

60 shares of Franklin Bank stock, issued to Elizabeth W. Platt; value not stated.

These were placed in a safety deposit box to which Elizabeth W. Platt and Charles R. Platt each had a key. The petition charges that Charles R. Platt wrongfully hypothecated these securities to Francis Bro. & Co., who sold such securities and appropriated them to their own use.

It is conceded in the printed record that Francis Bro. & Co. acted in perfect good faith in receiving these securities, and thought they had the right to receive and sell them. It appears that in the year 1900 Charles R. Platt began speculating in stocks and bonds. His business was done through Francis Bro. & Co. as his agents. For a time he was in a way suc-

cessful, but the market dropped and he became pressed in his account with Francis Bro. & Co. In this situation, after pledging what he had of his own, he went to his mother and got her to indorse these certificates of 100 shares each of National Lead preferred stock. At that time he told her that he was speculating and was "in the hole." This was May 9, 1901, and this stock is a part sought to be recovered for in this action. Later the mother, who was going to Europe, gave the son a power of attorney, which reads:

"Know all men by these presents that I, Elizabeth W. Platt, of the city of St. Louis, do hereby make, constitute and appoint Charles R. Platt of said city and State my attorney for me and in my name to sell and dispose of as and upon such terms and at such times as my said attorney shall think best, any real estate, shares of stock, bonds, notes, or other property, securities or investments whatsoever belonging to me, with power in my said attorney to sign my name to any conveyances or transfer to such real estate, stocks, notes, bonds, or other property, security or investments belonging to me, and to sell such things as fully and effectually in all respects as I myself could do if personally present, and I do, for myself, my heirs, executors and administrators ratify, confirm and agree to ratify and confirm whatsoever my said attorney shall do in my name and for me.

"In witness whereof I have hereunto set my hand and seal at the city of St. Louis, the 25th of June, 1901.

"ELIZABETH W. PLATT."

All other hypothecations of securities were under this power of attorney and during the absence of the mother in Europe. It should also be stated that Charles R. Platt undertook to hypothecate some of these securities after the deposit of the National Lead preferred stock, and one of Francis Bro. & Co. sug-

gested that, in as much as the stock was in Mrs. Platt's name, there should be a power of attorney, and the power of attorney in question was afterwards brought in and left with the firm. The good faith admitted is, therefore, to the effect that such firm, under the power of attorney, thought that Charles R. Platt had the right to do what he did do, i. e., assign such securities to Francis Bro. & Co. as collateral for his individual indebtedness.

Suffice it to say at this point that Francis Bro. & Co. sold most of the securities above mentioned and applied most of the proceeds of those so sold by them to the individual indebtedness of Charles R. Platt. We are not attempting to detail the amounts in either case, because with the view we entertain as to the law applicable to this case, there is no necessity for more than a general statement as to these matters at this time. Nor is it necessary to go at length into the pleadings. By answer the defendants disclaim liability by way of a general denial, and among other things they plead a ratification of the acts of Charles R. Platt by the plaintiffs. There are other questions in the case upon which the judgment *nisi* in our judgment could not stand in present form, even if it be conceded that there was no ratification, but with our view upon the latter question we need discuss but two questions in the case (1) the force and effect of the power of attorney, and (2) the question of ratification and estoppel. The latter will call for more facts, which will be given in the course of the opinion.

I.   Defendants, Francis Bro. & Co., first urge that under the power of attorney they had a right to receive the bonds and stocks as collateral. We do not think this is true. There is no doubt that Charles R. Platt was by that instrument authorized to pledge these securities in deals for his mother. In other words, the power of attorney is broad enough to authorize him

to pledge such securities as collateral for obligations he might have contracted for his mother, as well as for obligations which the mother herself had contracted. The evidence shows that he was the business agent of the mother in a very broad sense of the term. He sold and bought securities for her. He received and deposited money for her. He checked upon her account in such deals. So that it might well be said that had he under this power of attorney, when coupled with the other authority in business matters which he possessed, bought stocks and bonds on his mother's account, he could have legally *pledged* the securities in question as collateral in such deals. But that is not in this case. He was buying and selling upon his own account. The obligations incurred were his own obligations, and neither his agency nor this power of attorney was broad enough to cover such a transaction. His power and right to pledge the securities here involved must be gathered from the power of attorney, and to our mind that instrument when read from its four corners only authorizes him to act in matters in which the mother herself was the interested party. It is not broad enough to authorize him to convert the mother's property to his own use, as he undertook to do. This contention is therefore ruled against the defendants.

II. We pass now to the question of ratification. Mrs. Platt could have authorized the son Charles R. Platt to have bought and sold securities in his name for her. Had she done this the pledges under this power of attorney would have been good. They would have been pledged for her use and benefit. Whatever this mother might have legally authorized done, she can ratify. She could have authorized the use of these securities in the son's adventures. She could have authorized trading by the son for her, but in his name. That she could have authorized these things is hornbook law.

That what she could have authorized to be done for her, can be ratified by her, although done without express authority, is likewise hornbook law. With this premise let us view the further facts of this case. During the administration of the estate Charles R. Platt was the dominant factor. He was given full rein after the estate was closed in the probate court. The business of the mother and the other heirs was managed by him from that time on to the eventful close of his career, financially speaking.    He sold securities belonging to the estate and purchased others in lieu thereof. Much of this business was done through Francis Bro. & Co. It is true that the purchases were placed in the name of the mother or some heir, and further true that the funds received by him for sales of securities were deposited to the credit of the mother. But it remains a fact in the case that Charles R. Platt, by his acts, acquiesced in by all the plaintiffs, handled the funds of the mother, or the funds of the estate if they should be so called, practically as if they were his own, so far as the parties with whom he dealt were concerned. These things, however, are only side lights and do not go to the meat of the question.

Reverting to the direct issue we find that on December 6, 1903, after nearly three years of speculation, Charles R. Platt confessed to his mother just what he had done. This was in the forenoon of that day and Mr. Lionberger, the present attorney for the plaintiffs, was called in that night, although it was Sunday. As to the conversation with his mother the son Charles R. Platt detailed the situation to J. D. P. Francis in a conversation on December 18 following. Mr. Francis asked young Platt, "Charlie, what does your mother think of the status of your account and these general transactions?" Platt replied, "Well, I had a talk with her on Sunday and at first she was very much shaken up and overcome, but finally she became reconciled to it," and that the mother further said, "Well, it is

all right, Charlie, we will have enough left anyhow."
After this confession of Charles R. Platt to his mother
Sunday morning and after the employment of Mr.
Lionberger and the second confession to him on Sun-
day night, matters took a rather prolonged course, un-
less it be upon the *theory* of a ratification of Charles
R. Platt's acts, by all parties interested. That the par-
ties plaintiff and their agent and representative were
fully apprised of the facts by these two confessions,
the evidence in the record leaves no doubt. That all
parties knew these securities had been pledged to
Francis Bro. & Co. as collateral to these speculative
deals on that date there can be no doubt. At this time
Lionberger, the then *alter ego* of the Platt family, was
informed that there were some things with Francis
Bro. & Co. yet undisposed of, and upon this question
the record is clear. As a matter of fact the 103 shares
of Pittsburg Plate Glass stock had not then been sold.
Platt knew this fact and Lionberger evidently learned
all from Platt. Lionberger's testimony so indicates.
But the Sunday conversation as to the state of affairs
is not all.

On Monday, December 7, Mr. Lionberger had
Charles R. Platt come to his office and bring him the
papers connected with the affair. The Pittsburg Plate
Glass stock was yet unsold. No notice came from
Lionberger, the *alter ego* of the plaintiffs, to Francis
Bro. & Co. No claim that these securities had been
wrongly hypothecated. On Tuesday December 8, 102
shares of the Pittsburg Plate Glass stock were sold and
on the same day Lionberger again had Charles R.
Platt at his office to obtain all the facts. That he did
on the 6th and 7th obtain the facts there can be but lit-
tle question. The estate had but few different kinds
of securities, as hereinbefore indicated. The facts were
few and simple and easily related. That young Platt
told both his mother and Lionberger that he had been

speculating through Francis Bro. & Co. and deposited the securities belonging to the estate as collateral and that part of them had been sold to make good his losses, can hardly be denied from this record. This appears not only from what is said, but may be read between the lines throughout. That they were likewise advised that a part of the securities were with Francis Bro. & Co. undisposed of is as certain as the other. On December 12, fifty shares of Cotton Compress stock were transferred from Francis Bro. & Co. to Mrs. Platt, of which stock we will speak further later. On December 15, Lionberger had Charles R. Platt go to the office of Francis Bro. & Co. and close up his account and bring to him all the unused and unappropriated securities used by Platt in his deals. That Platt went to the Francis office at the direction of Lionberger is admitted, and that he directed him just what to do when he got there is the only fair inference to be drawn from the conduct of both parties before and after the visit to the Francis office. Note the conduct. Lionberger told him to go. Lionberger watched him from a near-by building to see that he not only *went* but that he returned. When he returned Lionberger for the Platts accepted, received and turned over to the Platts the fruits of the visit. This record can hardly be read without the conclusion that the closing of the deal with Francis Bro. & Co. was directed by the Platts through their agent Mr. Lionberger. In law Lionberger's *acts* were their acts. If his acts amounted to a ratification of the transaction, his principals are bound. But in this instance they are doubly bound, because they received and appropriated the fruits of that direct visit to Francis Bro. & Co. The knowledge of their agent was their knowledge, so they received and accepted with knowledge. But the record shows their knowledge outside of Lionberger. They knew on Sunday the 6th the whole situation and when they received back the stocks and check of Fran-

cis Bro. & Co. for $1833.15, they must have known that it was a closing up of the deals had by Charles R. Platt through Francis Bro. & Co. It should be borne in mind that the last share of the Pittsburg Plate Glass stock was not sold until December 14 and Charles R. Platt was notified of this sale of the last one of the 103 shares on that day.

When Charles R. Platt settled with Francis Bro. & Co. under the very eye of Lionberger there remained undisposed of the 50 shares of Cotton Compress stock for which $2500 had been paid by Francis Bro. & Co.; 60 shares of Franklin Bank stock worth $15,000 and cash $1833.15. It is important to recollect on the question of ratification, that this Cotton Compress stock was not stock belonging to the estate, nor did the cash belong to the estate. Had Platt only turned over to Lionberger the bank stock which had been unlawfully pledged it might be hard to say that there was a ratification of all of Platt's deals through Francis Bro. & Co. through which the loss occurred. But that is not the case. Here we have $2500 of Cotton Compress stock which formed a part of the Platt deals through Francis Bro. & Co., but which did not belong to the estate, unless the acts of Charles R. Platt be so ratified as to make these deals the deals of the estate. Nor did the money belong to the estate. It could only become such in some similar way. The fact that Lionberger sent Platt over to get what was left and the further fact that he accepted for the Platts what was brought back to him are potent facts upon the question as to whether plaintiffs, with knowledge, through their lawfully authorized representative ratified the transactions of Charles R. Platt. That ratification was intended at the time is apparent from other facts. First, what the mother said to Charles R. after the shock of the confession had subdued. That remark touches the real situation and the thought of the parties. Listen to it, ''Well, it is all right, Charlie, we

will have enough left anyhow." In effect, it means you exceeded my authority to you, but I ratify and adopt your actions, and you now go and bring to me all the remains of your deals and we will have enough left. Accordingly her counsel directs the visit to Francis Bro. & Co. and receives the fruits of that visit, and empties them into the lap of the mother. The thought of saving the son's good name might have been a factor in this conduct of the mother, but we need not speculate. That there was an intention to permit the close of these deals through Francis Bro. & Co. by Charles R. Platt and accept the results of the same, is indicated by further facts: (1) they fail to notify Francis Bro. & Co. not to sell the Pittsburg Plate Glass and other stocks; (2) they awaited the sale of the last share of this stock when money would be on hand to clear the deals and with some stock and cash left; (3) they send Charles R. Platt to get what was left, when it could not be done, except upon a closing up of the account; (4) they accept not only what was an asset of the estate, but they further accepted and received things which were the direct outgrowth of the deals, i. e., the cash and the Cotton Compress stock; (5) immediately after the settlement, by written instrument they revoked the power of attorney under which Charles R. had been acting, when if they did not in fact desire to close the deals recognizing the acts of Charles R. they should have revoked such power of attorney much sooner. As suggested in the brief, why permit this power of attorney to stand until about the very minute marking the close of Charles R. Platt's deals, and then revoke it, if it was not to say by action, thus far we ratify your acts, but when your settlement is made, we do not want you to act further? Sometime later demand was made upon Francis Bro. & Co. for the stocks and bonds sold, and in March, 1904, this suit was filed. These are some of the facts which induce us to believe that the plaintiffs have ratified

and made their own the dealings of Charles R. Platt with Francis Bro. & Co. The case is one largely of fact rather than of law. But for a moment let us look at the applicable law.

In Broughton Bros. v. Sumner, 80 Mo. App. 386, SMITH, P. J., has so tersely reiterated the hornbook law upon one question here involved, that although hornbook law, we quote it, thus:

"He who may authorize in the beginning may ratify in the end. [Bank v. Gay, 63 Mo. l. c. 39; Mechem on Agency, secs. 111, 112.] If a person who assumes to represent another is in fact the agent of such other, but has exceeded the limit of his authority, he has not thereby conferred any rights against his principal. When facts connected with the doing of the act are brought to the knowledge of him on whose behalf it was done, he may decide to sanction and confirm and adopt it as his own; or without expressly deciding about it he may so conduct himself that for the protection of innocent third persons, or of the assumed agent himself, the law will presume that he did so sanction and confirm such act and adopt it as his own. In either of these ways he may give effect to what was before unauthorized and without effect. [Mechem on Agency, sec. 110; Bank v. Gay, ante; Bank v. Dunn, 62 Mo. 79; Bless v. Jenkins, 129 Mo. l. c. 659; Chouteau v. Allen, 70 Mo. 290; Kiley v. Forsee, 57 Mo. 390.]"

In the case at bar Charles R. Platt was doubly the agent of his mother. He handled and did all her business, and in addition held this power of attorney. It is admitted that Francis Bro. & Co. acted in good faith when under the power of attorney they received the stocks in the way they did. Charles R. Platt evidently thought he could so act under the power of attorney. But that is not very particular in this case. Mrs. Platt could have authorized Charles R. Platt to do just what he did do. If so she could afterwards

ratify his unauthorized act. And as suggested in the Sumner case, supra, it makes no difference whether she ratifies the acts to protect some innocent third person, or to protect the good name of the son. In this case her talk with the son would indicate that his good name at that time figured some in the consideration. Another hornbook doctrine has been concisely stated by the St. Louis Court of Appeals in the case of Bohlmann v. Rossi, 73 Mo. l. c. 315, thus: "The principle of the instruction is that a principal can not accept and appropriate the fruits of an unauthorized contract of his agent and then controvert the authority of the agent to bind him. [St. Louis v. Davidson, 102 Mo. 149; Bates v. Spencer, 42 Mo. App. 184; Combs v. Sullivan, 105 Mo. 230; Fahy v. Springfield Grocery Co., 57 Mo. App. 73.]"

The instruction embodying the foregoing principle was approved and rightfully approved. If A without authority sells B's horse, and B accepts the money for the horse, he ratifies the unauthorized act, and is estopped to further question it. We have quoted from these two cases, because the principles reannounced by them are so succinctly stated that we could not improve thereon. As stated before, this is a case turning upon the facts rather than the law. Did Lionberger, the *alter ego* of plaintiffs, accept the fruits of Charles R. Platt's unauthorized acts, and did he do it knowingly? These are the questions. That Charles R. Platt made full disclosures to his mother and Mr. Lionberger is breathed in every circumstance and line of this record. There was nothing complicated to learn. There were but five or six different securities involved, and Mrs. Platt was advised that they had all been used, and most of them lost. Where they had been pledged was disclosed. The purpose for which pledged and sold was known. She gave the power of attorney and in law knew its contents. She evidently knew that the son was acting under this in-

strument. At least such is the only reasonable inference from the circumstances in evidence. Yet with this knowledge possessed by all the parties, young Platt is directed to go over to Francis Bro. & Co., and close up his deals, and bring to them what was left. This he did and this they accepted and kept as their own. Of the three items brought back after the settlement, but one belonged to Mrs. Platt, i. e., the bank stock. The Cotton Compress stock worth $2500 or more were fruits of the deals through Francis Bro. & Co. The cash, $1800 and more, was likewise the fruits of these deals. These two items grew out of the alleged unlawful pledging of Mrs. Platt's securities. They were the fruits of that unauthorized act. These fruits Mrs. Platt and Mr. Lionberger, her agent, received and kept. They cannot accept the fruits of the transactions and repudiate the transactions themselves. Had they only accepted the bank stock the case would be different, but they did not stop there. They accepted and kept and now have between $4500 and $5000 of the fruits of the unauthorized acts. This act upon the part of Mrs. Platt and the other plaintiffs estop them from now denying the authority of Charles R. Platt. Not only so, but they permitted Francis Bro. & Co. to sell a large block of their securities, as stated in other paragraphs of this opinion, after the parties were fully advised as to the situation. This act standing alone might not be sufficient to work an estoppel, but it adds weight to the others above detailed. Under the law and the facts, the judgment *nisi* should have been for the defendants, and the judgment is therefore reversed and the cause remanded to the circuit court with directions to enter up a judgment for the defendants.

This ruling disposes of the companion or cross-appeal of plaintiffs adverse to their contentions and this opinion is intended to cover both appeals. *Valliant, C. J., Lamm, Woodson* and *Ferriss, JJ.,* concur.

*Lamm, J.,* concurs in separate opinion, and *Valliant, C. J., Woodson, Graves* and *Ferriss, JJ.,* concur in his individual views. *Brown, J.,* dissents in opinion filed in which *Kennish, J.,* concurs.

## CONCURRING OPINION.

LAMM, J.—I stress the *good faith* of Francis Brother & Company.

Given a concession, as in this case by plaintiffs, that defendants acted in good faith, what does that deep-going admission mean in the eye of the law? It means: Lack of notice of the agent's fraud or wrong-doing; lack of notice of suspicious circumstances putting defendants on inquiry as to that fraud and wrong-doing. It means that what was done by defendants was done honestly, openly, sincerely, without deceit, covin or fraud in any of the protean shapes fraud takes on. It means defendants acted without simulation or pretense innocently and in an attitude of trust and confidence. [Black's Law Dict., tit. *"bona fide."*] "Good faith" is defined in the code of a sister State, as consisting "in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms and technicalities of law, together with an absence of all information or belief of facts that would render the transaction unconscientious." [Civil Code of Dakota 1877, sec. 2105; Crouch v. Bank, 156 Ill. l. c. 357; Searl v. School Dist., 133 U. S. l. c. 563.]

I think "good faith" in this case must also be held to mean that a business man might innocently take the terms of the power of attorney from the mother to the son as intended to give him leave to deal with her stocks at his will and on his account. That courts put a contrary meaning on the verbiage of the power results from close and technical reasoning. In short, it may be said to be establishing liability by a

technicality. But if liability can be established by one technicality, why may it not be avoided by another technicality, ratification? Francis Brother & Company have none of plaintiffs' property in pocket. They appropriated none of it to their own use. Their commissions as brokers or commission men were small and the usual brokerage. If they are liable for conversion, as said, it is because a technical view of the power of attorney makes them so, and because their acts as brokers technically make them guilty.

Now, what ought to be done is easily proved or presumed. Ratification was a natural and to-be-anticipated result on the part of a mother in dealing with the transactions of a trusted son, whose misconduct wrought the evil to her fortune, and in which transactions defendants acted in "good faith."

The proof makes a case of ratification, under such circumstances, and for those reasons I vote to concur in the opinion of my brother GRAVES. *Valliant, C. J.,* and *Graves, Woodson* and *Ferriss, JJ.,* concur in what is herein said.

## DISSENTING OPINION.

BROWN, J.—I. I concur in that part of the opinion of my brother GRAVES, which holds that the power of attorney received by Charles R. Platt from his mother, Elizabeth W. Platt, did not authorize him to pledge for his individual debts the corporate stock which stood in the name of his mother. The power of attorney gave notice that it only authorized Charles R. Platt to convey for the use and benefit of his mother the stocks standing in her name.

There is evidence in the record tending to prove that the defendants knew when they accepted the stocks in dispute as security for the account of Charles R. Platt, that said stocks did not belong to Charles. Most of the stocks had been purchased for Mrs. Platt

through defendants' brokerage firm. This evidence, however, was nullified by the generous admission of plaintiffs' attorney that the defendants acted in good faith when they accepted Mrs. Platt's property to secure debts incurred by Charles R. Platt.

II.  The law of ratification as announced in the opinion of my  learned brother, is, in a broad general sense, correct.  I also agree with him that this case "is one largely of fact, rather than law."  However, after diligently rereading the record, I am constrained to believe that the final conclusions recited in the majority opinion are incorrect.

That plaintiffs received from Francis Brother & Company $1833.15 as part of the proceeds of plaintiffs' stock, there is no dispute; but I am not able to find evidence in the record which proves that the plaintiffs or their attorney, Mr. Lionberger, at the time of receiving said money, knew that the title of Francis Brother & Company to some fifty thousand dollars worth of said stocks was invalid.

Before executing the power of attorney Mrs. Platt had transferred 300 shares of the stock to the National Lead Company, worth approximately $30,000, to her son, Charles R. Platt, by indorsing same in blank and giving him oral permission to pledge it for his individual debts.  That amount of the stock pledged by Charles R. Platt to Francis Brother & Company was undoubtedly a legitimate transaction, so far as the defendants were concerned; and in order to hold plaintiffs to have ratified the illegal pledging of stock by Charles R. Platt, it would appear to be necessary to prove that Mrs. Platt, or her attorney, not only knew that the $1833.15 was the proceeds of stock pledged by her son to Francis Brother & Company, but also that it was the proceeds of stock which he had no lawful power or right to so pledge.

Where an agent performs some acts which are legal and within the scope of his authority, and other acts which are illegal and beyond his lawful powers, there is no rule of law which declares that the principal by accepting all or a part of the fruits of those acts which are legal, thereby ratifies the illegal and unauthorized acts of his agent.

However, I do not think that on the law and facts this case turns on such a fine distinction as above outlined.

To my mind, the decisive point in this case is, did Mrs. Platt, or Lionberger, at the time of receiving the check for $1833.15, know that most of Mrs. Platt's stocks had been pledged to the defendants under and through a power of attorney which was insufficient to authorize Charles R. Platt to pledge such stocks to secure his individual debt.

If they knew that Francis Brother & Company had not received title to or a valid lien upon a large part of the stocks because of the insufficiency of the power of attorney, and with that knowledge they received and appropriated part of the proceeds of the stocks illegally pledged, they are barred from a recovery.

With these general remarks, I now go to the evidence.

On Sunday, December 6, 1903, Charles R. Platt told his mother that he had lost "every cent" of her money through speculations.

Mrs. Platt testified that she was so shocked by the information imparted to her by her son Charles that she immediately became ill. She seems to have been confined to her room at the time the $1833.15 was received and sent to her. On cross-examination, she testified as follows:

"Q. And when did your other children know that there had been turned over from Francis Brother & Company fifty shares of the Cotton Compress stock

and the check for eighteen hundred and thirty-three dollars and fifteen cents? A. They all knew it as soon as I knew it.

"Q. And when did you first know it? A. That I cannot remember, sir; I was very ill. I don't remember. I was very ill at the time, and I don't remember.

"Q. What was done with the check? A. The check was deposited in the bank.

"Q. Was it deposited in the bank to your credit? A. Yes, sir.

"Q. Do you remember whether or not you indorsed it for the purpose of having it deposited in bank to your credit? A. I did indorse it.

"Q. Will you say if that is your signature, 'Elizabeth W. Platt' on that check which I hand you? A. Yes, sir, this is my signature, but very faint. I was very sick at that time."

The check does not show on its face that it was in payment or settlement of any account. It reads as follows:

"Francis Bro. & Co., 214 N. Fourth St., St. Louis, December 15, 1903, No. eighty-eight hundred and two. Pay to the order of Oscar Hiemenz or ourselves $1833.15, eighteen hundred and thirty-three and fifteen one hundredth dollars, Francis Brother & Co., To Merchants-Laclede National Bank."

The check, as introduced, was indorsed as follows:

"Pay to the order of C. R. Platt.

"Oscar Hiemenz,

"Pay to the order of Elizabeth W. Platt.

"C. R. Platt.

"Elizabeth W. Platt."

The evidence of Mrs. Platt and Lionberger is to the effect that Mrs. Platt had no further conversation with her son, Charles R. Platt, until after the check for $1833.15 was brought to her by another son.

Lionberger was called by other members of the family on said December 6, 1903, and employed to "save whatever he could from the wreck." He did not confer at that time with Mrs. Platt, who seems to have been in her room too ill to transact business.

Lionberger conferred with Charles R. Platt and other members of the family, and obtained such information as he could regarding the illegal transactions of Charles R. Platt. He testified that Charles brought him many statements and memoranda regarding his dealings with defendants, and upon learning through Charles that there was some property of Mrs. Platt still undisposed of in the hands of Francis Brother & Company, particularly some Franklin Bank stock, he demanded of Charles that he procure from Francis Brother & Company whatever property was left and deliver the same to him (Lionberger), otherwise, he would attach such property in the hands of Francis Brother & Company.

With that direction, Charles went to the office of defendants, received the Franklin Bank stock, also some stock in the Cotton Compress Company, together with the check for $1833.15, and delivered the same to Lionberger.

Lionberger further testified that he put in the time between December 6 and December 15 in trying to find out the status of Charles R. Platt's dealings with defendants. Just how much he did find out about the details of those transactions (which covered a period of more than two years) is not made clear; but there is no evidence, nor even an intimation anywhere in the evidence, that Lionberger ascertained that some $50,000 of Mrs. Platt's stocks had been pledged under and through the power of attorney before mentioned.

Lionberger denies that at the time he received the $1833.15 check he had seen the final statement issued by the defendants to Charles R. Platt.

The final statement of Charles R. Platt's account issued to him by the defendants, contains no reference to the power of attorney.

It is clearly inferable from Lionberger's evidence that Charles R. Platt brought to him all the statements which he (Charles) had received from Francis Brother & Company prior to the last statement. Those statements likewise, do not refer to the power of attorney, nor impart any information as to how Mrs. Platt's stocks were pledged.

I have not been able to find one word in the evidence of any witness tending to prove that Lionberger had knowledge of the power of attorney or what stocks had been pledged under that power of attorney prior to the time he accepted the $1833.15.

Mr. Lionberger was cross-examined at some length by the learned attorneys for the defendant, and it is peculiar that they did not interrogate him regarding this most important feature of the case.

The majority opinion assumes that Lionberger understood the nature and purport of the power of attorney which Mrs. Platt had given her son, but I find that the power of attorney was brought to Mrs. Platt by her son, and she signed it without reading it. It is therefore not at all probable that she thought of it any more or that she called Mr. Lionberger's attention to it or that she knew what powers it really contained. The testimony on that point reads as follows:

"Q. What occurred in the interview between yourself and your son at the time you signed the power of attorney? A. Only that he said it was best that I should leave that in case of necessity in my absence. I signed it without reading it."

The majority opinion proceeds upon the theory that Mrs. Platt having signed the power of attorney, was in law bound to know its contents. I do not concede that under the issues here presented she was

bound to know more about the power of attorney than she did actually know; and I am sure, that even if she did understand the full legal effect of the power of attorney, she was not bound to know that her son Charles had made pledges which that power of attorney did not authorize him to make and thereby dissipated $50,000 worth of her stocks.

In other words, the execution of the power of attorney did not give her constructive notice that it had been misused.

Because Charles R. Platt could have informed his mother and Lionberger, her attorney, that he had used the power of attorney in pledging some $50,000 worth of her stocks, the majority opinion assumes and surmises that he did so.

If I have correctly interpreted the law, ratification cannot be established in that manner. In this State when matters of ratification or estoppel are relied upon as a defense, they must be pleaded. [Geo. B. Loving Co. v. Hesperian Cattle Company, 176 Mo. 330, l. c. 353 and 354; Golden v. Tyer, 180 Mo. l. c. 204.]

Like all other affirmative defenses, a ratification when pleaded must be proven, and cannot be built up by inferences and surmises not fully established by the evidence. This doctrine is ably supported in an opinion written by Judge BOND while a member of the St. Louis Court of Appeals. [Gaskill v. Lead & Zinc Co., 84 Mo. App. l. c. 525.]

What seems to have misled my brother most seriously is the evidence of J. D. P. Francis, one of the defendants, which is as follows:

"Witness: May it please the court, there is one matter I would like to state. Mr. Lionberger, it would come in the form of a question something like this: Did Charles R. Platt ever say anything to you himself regarding the knowledge that his mother had of any

of these transactions, or his having a talk with her regarding same?

"Mr. Lionberger: I of course object to that, as improper evidence but for your exoneration, I don't care, put it in.

"Witness: There is no exoneration about it. It was at a late stage of the case. It was merely this, in connection with the sale of these stocks at the latter end, and it was quite at the latter end. It must have been about the 12th of December, somewhere along there. I said to him, 'Charlie, what does your mother think of the status of your account and these general transactions?' 'Well,' he said, 'I had a talk with her on Sunday and at first she was very much shaken up and overcome, but finally'—now this word is not the one that I am certain that I can remember, but reconciled is the one that I recall,—'but that she became reconciled to it.'

"Q. What time of the year? A. Well, it was on the 6th of December that this talk was had.

"Mr. Lionberger: I object to that; that is, after all these events,

"Witness: I beg your pardon, there were trades closed after that.

"Q. (By Mr. Lee): Go ahead. A. And she had become reconciled and said to him something like this, 'Well, it is all right, Charlie, we will have enough left anyhow.' On the 8th and 14th we sold stock, Mr. Lionberger, sold the Pittsburg Plate Glass stock."

This evidence is of course hearsay, and seems to have only been admitted through the generosity of plaintiffs' attorney. Mr. Francis had never conversed with Mrs. Platt about the matter at all, and the evidence he gave came as pure hearsay from the lips of Charles R. Platt, whose criminal conduct greatly discredits his statement. If he did make the statements attributed to him, I do not know of any theory upon

which they were competent evidence against Mrs. Platt.

When Charles R. Platt gave his deposition and was confronted by all the parties and their attorneys, he denied having related to any member of defendants' firm any conversation between him and his mother.

"Q. (By Mr. Lee): Did you ever report to Mr. Kennett that after you had told your mother of the loss of her property, her stock, that she had said it was done and it was all over and could not be undone? A. Never.

"Q. You never said anything like that? A. No, sir.

"Q. Never reported to Mr. Kennett— A. I never reported to Mr. Kennett any interview with my mother.

"Q. Or any other member of the firm? A. No, sir.

"Q. Neither David R. Francis, Jr., nor Perry Francis? A. No, sir."

If any reliance could be placed upon the statements of Charles R. Platt at all, surely his sworn testimony would be worth more than his mere unsworn statement to Mr. Francis.

I am not inclined to give any probative force to the evidence of Charles R. Platt, except where it is corroborated by other evidence.

The majority opinion lays much stress upon the evidence of J. D. P. Francis as clearly proving an intention on the part of Mrs. Platt to acquiesce in and ratify the acts of her son in misappropriating her property. If any logical inference can be drawn from the evidence of J. D. Perry Francis as affecting the issues in this case, that inference is that before the sale of the Pittsburgh Plate Glass stock the defendants had knowledge that they had aided Charles R.

Platt in misappropriating his mother's stocks and were desirous of knowing how she felt over the transaction and what she intended to do about it.

The majority opinion mentions the desire of Mrs. Platt to preserve the good name of her son. I am not able to find in the record any foundation for such a surmise. The fact that the Platts employed an attorney as soon as the embezzlement was discovered, seems to indicate that the matter of preventing the disgrace which would fall upon Charles by the exposure of his crimes had not entered their minds.

Another error, or at least what appears to me to be an error, of the majority opinion, is the fact that it treats the receipt and retention by plaintiffs of the Cotton Compress stock (worth something over $2500) as a ratification of the unlawful acts of Charles R. Platt.

The receipt of the Cotton Compress stock is not pleaded by the defendants as a ratification; in fact, it is not mentioned in their answer and therefore, does not affect the issues in this case.

"To sustain an issue of estoppel, the evidence must prove the very facts upon which the alleged estoppel is based. The estoppel pleaded cannot be supported by evidence tending to show another and different estoppel. Before any of the consequences of an estoppel can be claimed, the facts constituting it must be found or given in evidence." [16 Cyc. 811.]

The Cotton Compress stock is not mentioned in any of the statements issued to Charles R. Platt by Francis Brother & Company, and seems to have been in some way disconnected with the stock he pledged to defendants.

As I view the evidence, the only thing proven which in any way tends to support the defendants' plea of estoppel by ratification, is the delay of Lionberger in demanding the return of the stocks wrongfully pledged under the power of attorney; and on

that point I do not think the facts are sufficient to create ratification.

At most, his delay could only affect the Plate Glass stock, as all other stocks which were sold by defendants had been sold before Lionberger was employed and before Mrs. Platt knew of the embezzlement of the property by her son.

There is nothing in the record which proves that defendants would have changed the course of their conduct or acted differently if demand had been made by Lionberger on the day he was employed, for the return of the $50,000 worth of stock (approximately) hypothecated through the power of attorney.

Evidently defendants would have held the proceeds of the stock already sold and the Plate Glass stock and insisted, as they have insisted, that they had obtained through the power of attorney a valid lien on said stocks.

To my mind, it is well-nigh preposterous to contend that Lionberger knowingly accepted the paltry $1833.15 in settlement of a valid claim of more than $50,000 against defendants who are entirely solvent.

The law of ratification is a valuable rule of equity jurisprudence and is often appropriately applied to prevent injustice under the form of law; but to suffer that doctrine to be invoked under the facts in evidence in this case to defeat the just and legal claim of the plaintiffs, is utterly at variance with what I have hitherto understood to be equity.

I have carefully examined the authorities cited by my learned brother in the majority opinion, and while the language quoted lends some support to the conclusions reached, I find that the facts in all the cases cited in the majority opinion are entirely different from those in the case at bar.

"Delay in repudiating an unauthorized act of an agent cannot constitute a ratification if the principal

during such time, was ignorant of the facts." [31 Cyc. 1277.]

"In order to bind the principal as by a ratification, he must have acted with full knowledge of all the material facts." [19 Cyc. 202.]

The facts relied upon to create a ratification in the case of Garesche v. Levering Investment Company, 146 Mo. 436, quoted by the writer in the opinion filed in Division Two, are more nearly like the facts in this action than any case which has come under his observation. In the Garesche case, the plaintiffs held an estate of remainder in certain real estate of their grandfather; their mother and another party had been named as executors in the will of their grandfather and by that instrument were granted power to sell the real estate for reinvestment. The executors organized a corporation and deeded the real estate to the corporation, on the theory that this would avert the expense of partitioning it among the remaindermen. When the time arrived for the remaindermen to receive the real estate devised to them by their grandfather, they were called together by the surviving executor and given stock in the corporation in proportion to their respective interests in the real estate. The remaindermen received and held their shares of stock for about five months and dividends on same were paid to and accepted by them. The remaindermen, during the time they held the stock, were ignorant of the fact that the will of their grandfather did not authorize the executors to incorporate the estate. They could have found out that fact by going to the probate court and examining the will, the same as Mr. Lionberger or Mrs. Platt could have ascertained the terms of the Platt power of attorney by going to the recorder's office or by calling on Francis Brother & Company with whom it had been left; but the remaindermen did not do so until about five months after they had received their corporate stock, when they

instituted a suit to divest the corporation of title to the real estate and for an accounting. The corporation (defendant in that case) contended that the remaindermen (plaintiffs in that case) had ratified the placing of their real estate in the corporation by the acceptance of stock in said corporation and by holding said stock and receiving the dividends thereon. This court, however, in a very carefully prepared opinion by MARSHALL, J., held that the remaindermen had not by the above recited acts ratified the unlawful acts of the executors in conveying their real estate to a corporation, and sustained a recovery by the plaintiffs. The recovery in that case was sustained upon the theory that the remaindermen in accepting the corporate stock and the dividends thereon, were not aware of their legal rights (though all the facts concerning the incorporation of the estate were matters of public record), and the fact that they waited several months to ascertain their rights, was not such an acquiescence or ratification of the wrongful acts of the executors as would bar them from maintaining their action.

Defendants' learned attorneys, in their last brief filed in this case, admit that the law is correctly announced in the Garesche case.

For the reasons before recited, I respectfully dissent from the majority opinion filed in this case. *Kennish, J.,* concurs in the views expressed herein.